RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 14a0243p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

NASSER M. BEYDOUN and MAYSA BEYDOUN, individually and as parents and general guardians of AB, JB, and MJ.B, minor children,

    *Plaintiffs-Appellants,*

  *v.*

WATANIYA RESTAURANTS HOLDING, Q.S.C.; QATAR NATIONAL HOTELS COMPANY; GLOBAL INVESTMENT HOUSE; HAMAD BIN ABDULLAH AL ATTIYAH; ABDUL AZZIZ BIN HAMAD AL ATTIYA; ABDUL AZZIZ BIN MOHAMED AL ATTIYA; KHALID BIN MOHAMMED AL ATTIYAH,

    *Defendants-Appellees.*

No. 13-2437

> Appeal from the United States District Court
> for the Eastern District of Michigan at Detroit.
> No. 2:12-cv-10461—Bernard A. Friedman, District Judge.
>
> Argued:  August 6, 2014
>
> Decided and Filed:  September 19, 2014
>
> Before:  COOK and GRIFFIN, Circuit Judges; RICE, District Judge.[*]

_____

## COUNSEL

**ARGUED:**  James P. Allen, Sr., ALLEN BROTHERS ATTORNEYS AND COUNSELORS, PLLC, Detroit, Michigan, for Appellants.  Jonathan D. King, DLA PIPER LLP, Chicago, Illinois, for Appellees.  **ON BRIEF:**  Edward M. Turfe, TURFE LAW, PLLC, Detroit, Michigan, for Appellants.  Jonathan D. King, Joseph A. Roselius, Stephanie A. Zosak, DLA PIPER LLP, Chicago, Illinois, for Appellees.

_____

[*]The Honorable Walter Herbert Rice, Senior United States District Judge for the Southern District of Ohio, sitting by designation.

1

—————————————

**OPINION**

—————————————

GRIFFIN, Circuit Judge.   Plaintiffs sued plaintiff Nasser Beydoun's former employer, Qatari-based Wataniya Restaurants Holding—along with Wataniya shareholders and members of the Wataniya board of directors—in federal district court in Michigan, alleging various causes of action based on events that took place after Beydoun's employment as Wataniya's CEO ended contentiously.  The district court dismissed plaintiffs' complaint for lack of personal jurisdiction.  Because plaintiffs have failed to establish that their alleged causes of action proximately resulted from Wataniya's contacts with Michigan, we affirm the judgment of the district court.

I.

None of the defendants in this case are citizens of the United States, nor of Michigan.  Wataniya is a Qatari corporation that, among other things, operates restaurant franchises in the Middle East and North Africa.  Its principal place of business is in Qatar, and it has never operated any franchises in the United States, nor does it have any offices, representatives, or employees in Michigan.  Qatar National Hotels Company is a Qatari company based in Qatar with no ties to Michigan.  Global Investment House is based in Kuwait with no ties to Michigan.  The non-Wataniya defendants named in Beydoun's complaint who are natural persons were shareholders or representatives of shareholders of Wataniya, and all are citizens of Qatar.

Beydoun is a citizen of the United States and of Michigan.  He is a businessman in Detroit.  In 2006, Beydoun was approached by Donald Jordan, a representative of Wataniya, about Beydoun moving to Qatar and becoming Wataniya's CEO.  Jordan told Beydoun that Wataniya's goal in recruiting him was to "bring Western culture and restaurant franchises to the Middle East."  In January 2007, Beydoun and Jordan met at a Starbucks in Northville, Michigan.  During that meeting, Beydoun and Jordan

> spoke at length regarding the terms and conditions of [Beydoun's] employment with Wataniya and [Beydoun's] moving to Qatar, as well as "the vision" and desires of the . . . Board members, directors and shareholders of Wataniya.  At the conclusion of [the] meeting [Jordan and Beydoun] had agreed in principle that

[Beydoun] would accept the position as President and Chief Operating Officer of Wataniya. [Beydoun] advised Jordan that [he] needed to discuss everything with [his] wife . . . and think things over.

Following the Starbucks meeting, Jordan and Beydoun had "[m]ultiple discussions and emails" about the position, occurring after Jordan returned to Qatar (Beydoun remained in Michigan).[1] Beydoun "ultimately accepted the position" and moved to Qatar in mid-March 2007; his family followed in August 2008.

After moving to Qatar, Beydoun made more than ten business trips to Michigan on Wataniya's behalf. During this same time, Wataniya purchased restaurant equipment from several Michigan-based companies.

Wataniya lost money while Beydoun was CEO; consequently, the relationship between the two soured. In late October 2009, Beydoun was summoned to meet with Hamad bin Abdullah al Attiyah (Hamad). Hamad was a shareholder in Wataniya and, at the time, was an adviser to Wataniya's board. At the meeting, Hamad accused Beydoun of mismanaging Wataniya and accused Beydoun of stealing "significant sums of money from the company." Hamad told Beydoun that he would have to personally reimburse the company for $13.7 million for losses the company had sustained. Beydoun responded that the company had not yet paid him his salary nor reimbursed him for his living expenses. Following this meeting, Beydoun learned that Wataniya had revoked his exit visa, rendering Beydoun unable to leave Qatar.[2]

On December 12, 2009, Beydoun filed suit in the Qatari courts seeking back pay and benefits. Four days later, Wataniya filed suit against Beydoun in Qatar, seeking to recover $13.7 million. Beydoun claims that many of the allegations in Wataniya's lawsuit were false.

---

[1]Plaintiffs suggest that Beydoun and Jordan met in person in Michigan after the January 2007 Starbucks meeting to discuss the Wataniya CEO job. *See* Plaintiffs' Br. at 11 (stating that after the Starbucks meeting "Jordan and Beydoun, while in Michigan, exchanged several emails discussing the Wataniya opportunity"); *id*. at 20 (stating that Jordan "met with Beydoun on more than one occasion in Michigan"). Although Beydoun's affidavit indicates multiple communications via email and telephone between Beydoun and Jordan discussing the Wataniya CEO position, it only references one in-person meeting in Michigan—the Starbucks meeting. Indeed, Beydoun's affidavit specifically indicates that Beydoun's and Jordan's post-Starbucks-meeting communications occurred after Jordan had returned to Qatar and Beydoun remained in Michigan.

[2]Apparently, under Qatari law, an immigrant employee such as Beydoun must be "sponsored" by his employer while in Qatar, and the sponsoring employer has "absolute discretion to revoke an expatriate employee's exit visa."

Additionally, Wataniya lodged a criminal complaint against Beydoun.  Ultimately, Wataniya's lawsuit was dismissed, and Beydoun's lawsuit was successful—Beydoun was awarded $170,000 by the Qatari courts.  The criminal complaint against Beydoun was dismissed as well.  However, Beydoun's exit visa was not reinstated while these matters were litigated and resolved.  Accordingly, Beydoun was not legally permitted to return home to Michigan until February 7, 2011.

On February 2, 2012, plaintiffs filed the instant lawsuit.  The complaint alleged thirteen counts, including false imprisonment, abuse of process, and malicious prosecution.  The complaint alleged limited personal jurisdiction over all defendants because they "[had] transacted business within the State of Michigan, and [their] agents . . . caused consequences to occur in the state of Michigan, which actions and consequences have resulted in this action for tort."

Defendants moved to dismiss under Rule 12(b)(2) of the Federal Rules of Civil Procedure on the basis that the court lacked personal jurisdiction over them.  The district court agreed and dismissed plaintiffs' claims.  Plaintiffs timely appealed.

II.

We review de novo a motion to dismiss under Rule 12(b)(2).  *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 887 (6th Cir. 2002).  The party seeking to establish the existence of personal jurisdiction bears the burden to establish such jurisdiction, *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1261–62 (6th Cir. 1996), "over each defendant independently." *Days Inns Worldwide, Inc. v. Patel*, 445 F.3d 899, 904 (6th Cir. 2006) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)).  When, as here, "a district court rules on a jurisdictional motion to dismiss made pursuant to [Rule 12(b)(2)] without conducting an evidentiary hearing, the court must consider the pleadings and affidavits in a light most favorable to the [nonmoving party—here, plaintiffs]." *CompuServe*, 89 F.3d at 1262.  "To defeat such a motion, [plaintiffs] need only make a prima facie showing of jurisdiction." *Id.*  In deciding a motion under Rule 12(b)(2), this court "will construe the facts in the light most favorable to the nonmoving party." *Neogen Corp.*, 282 F.3d at 887.

III.

"A federal court's exercise of personal jurisdiction in a diversity of citizenship case must be both (1) authorized by the law of the state in which it sits, and (2) in accordance with the Due Process Clause of the Fourteenth Amendment." *Id.* at 888 (citing *Reynolds v. Int'l Amateur Athletic Fed'n*, 23 F.3d 1110, 1115 (6th Cir. 1994)). We address each part of this test in turn.

IV.

Michigan's long-arm statute, Mich. Comp. Laws § 600.715, provides limited personal jurisdiction over a nonresident corporation for claims "arising out of the act or acts which create any of the following relationships," including "[t]he transaction of any business within the state." The Michigan Legislature's "use of the word 'any' to define the amount of business that must be transacted establishes that even the slightest transaction is sufficient to bring a corporation within Michigan's long-arm jurisdiction." *Oberlies v. Searchmont Resort, Inc.*, 633 N.W.2d 408, 413 (Mich. Ct. App. 2001); *see also Miller v. AXA Winterthur Ins. Co.*, 694 F.3d 675, 679 (6th Cir. 2012).

Wataniya's contacts with Michigan satisfy Michigan's long-arm statute. Defendants do not dispute that Wataniya, acting through its agent, Jordan, travelled to Michigan for the purpose of recruiting Beydoun to be its CEO. This single act is sufficient to satisfy Michigan's long-arm statute under the broad "slightest transaction" test described above. However, even assuming, *arguendo*, that Wataniya's recruitment of Beydoun in Michigan was not enough on its own, Wataniya subsequently made over ten business trips to Michigan and made numerous purchases of equipment from Michigan companies. These contacts certainly satisfy the "slightest transaction" test above.

Accordingly, Michigan's long-arm statute is satisfied as to Wataniya. Michigan's long-arm statute is not satisfied, however, as to the remaining non-Wataniya defendants, none of whom had any contact with Michigan whatsoever. Again, it is plaintiffs' burden to establish personal jurisdiction as to each defendant. *CompuServe, Inc.*, 89 F.3d at 1261–62; *Days Inns Worldwide, Inc.*, 445 F.3d at 904. Here, plaintiffs' appellate brief focuses exclusively on Wataniya; plaintiffs do not address all defendants separately. Plaintiffs not only fail in their

appellate brief to explain whether the non-Wataniya defendants had any contact with Michigan, they fail to mention the non-Wataniya defendants altogether.  By failing to address any claims as to the non-Wataniya defendants, plaintiffs have failed to meet their burden to establish jurisdiction over each defendant individually.

V.

"Although Michigan's long-arm statute authorizes personal jurisdiction over [Wataniya], a court in Michigan cannot exercise its personal jurisdiction in violation of [Wataniya's] constitutional right to due process." *Neogen Corp.*, 282 F.3d at 889.  Accordingly, "[i]n order to survive [Wataniya's] motion to dismiss, [plaintiffs are] required to present a prima facie case that the district court's exercise of personal jurisdiction would not offend due process." *Id.*  When determining whether a district court's exercise of personal jurisdiction would offend due process, "[t]he relevant inquiry is whether the facts of the case demonstrate that the non-resident defendant possesses such minimum contacts with the forum state that the exercise of jurisdiction would comport with 'traditional notions of fair play and substantial justice.'"  *Theunissen v. Matthews*, 935 F.2d 1454, 1459 (6th Cir. 1991) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).  In *Southern Machine Co. v. Mohasco Industries, Inc., this* court articulated a three-pronged test to guide this determination:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state.  Second, the cause of action must arise from the defendant's activities there.  Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

401 F.2d 374, 381 (6th Cir. 1968).  We address each prong of this test in turn.

A.

> Purposeful availment . . . is present where the defendant's contacts with the forum state proximately result from actions by the defendant *himself* that create a substantial connection with the forum [s]tate, and where the defendant's conduct and connection with the forum are such that he should reasonably anticipate being haled into court there.

*Neogen Corp.,* 282 F.3d at 889 (citations, quotation marks, and emphasis omitted). "In the Sixth Circuit, the emphasis in the purposeful availment inquiry is whether the defendant has engaged in some overt actions connecting the defendant with the forum state." *Fortis Corporate Ins. v. Viken Ship Mgmt.,* 450 F.3d 214, 218 (6th Cir. 2006) (citations and quotation marks omitted).

Here, plaintiff argues that Wataniya purposefully availed itself of Michigan: (1) by targeting the Detroit area for its CEO candidates; (2) by corresponding with Beydoun; (3) by selecting Beydoun to be CEO; (4) by engaging in business trips to and equipment purchases in Michigan once Beydoun was CEO; and (5) by "caus[ing] an investigation in Michigan in an effort to bolster its efforts in the Qatari courts" once proceedings against Beydoun there had commenced.

Plaintiffs also allege that Wataniya sent private investigators to Michigan to investigate Beydoun for purposes of prosecuting their lawsuit in Qatar—plaintiffs argue that this constitutes purposeful availment. However, as the district court correctly recognized, this allegation is based on hearsay. The sole factual support for the allegation is the affidavit of Kassem Chammout, who averred that he was told by a third party, Kamal Mustapha, "an employee of Wataniya," that Wataniya sent the investigators to Michigan. Chammout does not claim to have any personal knowledge of these investigators, nor does plaintiff identify any other evidence relevant to this allegation. In general, it is improper for a court to consider hearsay statements when ruling on a motion to dismiss. *See Kamen v. Am. Tel. & Tel. Co.,* 791 F.2d 1006, 1011 (2d Cir. 1986). Accordingly, we decline to address plaintiffs' allegations about the private investigators.

Whether Wataniya's contacts with Michigan are sufficient to satisfy the "purposeful availment" requirement is not clear. On one hand, Beydoun's repeated business trips to and purchases of equipment in Michigan on behalf of Wataniya are "overt actions connecting [Wataniya] with" Michigan. *Fortis Corporate Ins.,* 450 F.3d at 218. And, these business trips were directed at Michigan specifically, because Michigan was where Beydoun had business contacts that permitted Wataniya to purchase equipment. "Despite its label, [the 'purposeful availment'] prong includes both purposeful availment and purposeful direction. It may be satisfied by purposeful availment of the privilege of doing business in the forum; by purposeful

direction of activities at the forum; or by some combination thereof." 4 Fed. Prac. & Proc. Civ. § 1067.1 (3d ed.) (citation omitted). On the other hand, we doubt whether these business trips and equipment purchases were a sufficiently "substantial connection" such that Wataniya would anticipate being haled into a Michigan court. *Neogen Corp.*, 282 F.3d at 889 (citation and quotation marks omitted). We need not decide whether Wataniya's contacts with Michigan satisfy the purposeful availment prong of the *Southern Machine* test because, even assuming, *arguendo*, that plaintiffs have satisfied the purposeful availment prong, they have failed to satisfy the other two prongs.

B.

To satisfy the "arising from" prong of the *Southern Machine* test, the plaintiff must demonstrate a causal nexus between the defendant's contacts with the forum state and the plaintiff's alleged cause of action. *See Burger King Corp.*, 471 U.S. at 474 ("[I]t may well be unfair to allow [out-of-state parties] to escape having to account in other States for consequences that arise proximately from such activities."). As our circuit has explained, "the cause of action must . . . have a substantial connection with the defendant's in-state activities." *Dean v. Motel 6 Operating L.P.*, 134 F.3d 1269, 1275 (6th Cir. 1998) (quotation marks omitted). Put another way, "[t]he 'arising from' requirement under the second prong [of the *Southern Machine* test] is satisfied when the operative facts of the controversy arise from the defendant's contacts with the state. 'Only when the operative facts of the controversy are not related to the defendant's contact with the state can it be said that the cause of action does not arise from that contract.'" *Calphalon Corp. v. Rowlette*, 228 F.3d 718, 723–24 (6th Cir. 2000) (quoting *S. Mach. Co.*, 401 F.2d at 384 n.29); *see also Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 451 (6th Cir. 2012) ("Even a single act by a defendant directed toward the relevant forum *that gives rise to a cause of action* can support" a finding of personal jurisdiction. (emphasis added, citation, quotation marks, and alterations omitted)).

Not all of our opinions treat this analysis the same. Some apply the requirement that there be a causal connection between the party's contacts with the forum state and the cause of action as part of the "purposeful availment" prong of the *Southern Machine* test, rather than the "arising from" prong. These opinions, at the very least, implicitly recognize that the analysis on

the first prong of the *Southern Machine* test involves some overlap with the analysis on the second prong. *See, e.g., Neogen Corp.*, 282 F.3d at 891 ("'[P]urposeful availment' is something akin to a deliberate undertaking to do *or cause an act or thing to be done* in [the forum state] or conduct which can be properly regarded as a prime generating cause of the effects resulting in [the forum state], something more than a passive availment of [the forum state's] opportunities." (emphasis added, citation omitted)); *compare Dean*, 134 F.3d at 1275 (reasoning that the requirement that the cause of action must have a "substantial connection with the defendant's in-state activities" applies to the *Southern Machine*'s "arising from" prong), *with Cmty. Trust Bancorp, Inc. v. Cmty. Trust Fin. Corp.*, 692 F.3d 469, 472 (6th Cir. 2012) (citing *Neogen Corp.*, 282 F.3d at 889) (reasoning that the "substantial connection" requirement applies to the "purposeful availment" prong of the *Southern Machine* test). In all cases, however, the elements required to establish personal jurisdiction remain the same—some cases simply address them at different levels of analysis.

Here, plaintiffs argue that "but for Jordan's outreach to . . . Beydoun on behalf of Wataniya, Beydoun would not have been in a position to have been injured by Wataniya. . . . Thus, Beydoun's cause of action arises out of Wataniya's connections to Michigan." Essentially, plaintiffs argue that their causes of action arose from Wataniya's initial contact with Michigan because but for the initial contact with Michigan, Beydoun would never have moved to Qatar, and if Beydoun had never moved to Qatar, he could not have been wrongfully blamed for Wataniya's financial losses and wrongfully detained for them.

We disagree because more than mere but-for causation is required to support a finding of personal jurisdiction. To the contrary, the plaintiff's cause of action must be proximately caused by the defendant's contacts with the forum state. Indeed, the Supreme Court has emphasized that only consequences that *proximately* result from a party's contacts with a forum state will give rise to jurisdiction. *Burger King Corp.*, 471 U.S. at 474. As our sister circuits have noted:

> [A]lthough the analysis may begin with but-for causation, it cannot end there. The animating principle behind the relatedness requirement is the notion of a tacit quid pro quo that makes litigation in the forum reasonably foreseeable. *See Burger King,* 471 U.S. at 475–76. . . . But-for causation cannot be the sole measure of relatedness because it is vastly overinclusive in its calculation of a defendant's reciprocal obligations. The problem is that it "has . . . no limiting

principle; it literally embraces every event that hindsight can logically identify in the causative chain." *See Nowak v. Tak How Invs., Ltd.*, 94 F.3d 708, 715 (1st Cir. 1996). If but-for causation sufficed, then defendants' jurisdictional obligations would bear no meaningful relationship to the scope of the "benefits and protection" received from the forum. *See Int'l Shoe*, 326 U.S. at 319. As a result, the relatedness inquiry cannot stop at but-for causation.

*O'Connor v. Sandy Lane Hotel Co., Ltd.*, 496 F.3d 312, 322 (3d Cir. 2007).

In this case, plaintiffs have failed to establish that their alleged causes of action proximately resulted from Wataniya's contacts with Michigan. Plaintiffs' alleged causes of action all occurred in Qatar, years after Wataniya recruited Beydoun in Michigan. Plaintiffs do not argue that Wataniya's financial collapse—which led to the dispute in Qatar that caused Wataniya to detain Beydoun—was the result of any of Beydoun's business trips to Michigan or his equipment purchases in Michigan, each of which was done on Wataniya's behalf. To the contrary, plaintiffs argue that Wataniya's financial collapse was the result of the global economic downturn in 2007–2008. In other words, plaintiffs have failed to establish that "the operative facts of the controversy are . . . related to [Wataniya's] contact with the state," *Calphalon Corp.*, 228 F.3d at 723, or that their causes of action had a "substantial connection" to Wataniya's activities in Michigan. *Dean*, 134 F.3d at 1275.

C.

Regarding the third prong of the *Southern Machine* test, the district court correctly ruled that it would be unreasonable to exercise jurisdiction over Wataniya. The Supreme Court has held that the reasonableness analysis is a function of three factors: "[1] the burden on the defendant, [2] the interests of the forum State, and [3] the plaintiff's interest in obtaining relief." *Asahi Metal Indus. Co. v. Super. Court of Cal.*, 480 U.S. 102, 113 (1987) (citation omitted); *see generally* Lauren A. Kwapis, *The United States Supreme Court Brings General Jurisdiction Over Corporate Defendants Back "At Home,"* Mich. Defense Quarterly, April 2014 at 21 (describing recent Supreme Court developments in personal jurisdiction over foreign corporate defendants). Here, even assuming, *arguendo*, that plaintiffs' interest in obtaining relief counsels in favor of a finding of reasonableness, the other two factors weigh heavily against such a finding. As the district court noted, "all the relevant underlying events occurred in Qatar,"

Wataniya is a Qatari corporation, and "most of the discovery will necessarily involve the exhaustive production of Qatari legal papers and deposing Qatari legal experts." And, the Supreme Court has held that "[g]reat care and reserve should be exercised when extending our notions of personal jurisdiction into the international field." *Asahi*, 480 U.S. at 115. Moreover, plaintiffs make no argument whatsoever that in this particular case Michigan has an interest in exercising its jurisdiction. Accordingly, we conclude that it would be unreasonable to find personal jurisdiction in Michigan.

VI.

For these reasons, we affirm the judgment of the district court.